Timothy W. Steadman, SBN: 022708
Morgan B. McCain, SBN: 025878
**STEADMAN LAW FIRM, PLC**
1310 E. Southern Avenue, Suite 201
Mesa, Arizona 85204
Phone: (480) 964-2800
Fax: (480) 964-2802
Email: ecf@steadmanlawfirm.net

*Attorney for Debtors*

## UNITED STATES BANKRUPTCY COURT

## DISTRICT OF ARIZONA

In re:

RUBEN PRESTON, and
LINDA M. PRESTON;

Debtors.

Case No. 2:13-bk-00714-EPB

In Proceedings Under Chapter 11

**FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTORS' PLAN OF REORGANIZATION**

### I    INTRODUCTION TO THE DISCLOSURE STATEMENT

This Amended Disclosure Statement is submitted by Ruben Preston and Linda M. Preston, the Debtors-in-Possession ("Debtors") pursuant to 11 U.S.C. § 1125. This statement contains information about the Debtors and describes their Plan of Reorganization (the "Plan"). **A full copy of the Plan is attached to this Disclosure Statement as Exhibit A. *Your rights may be affected.***

You should read the Plan and this Amended Disclosure Statement carefully and discuss them with your attorney. If you do not have an attorney, you may wish to consult one. Be sure to read both the Plan as well as the Amended Disclosure Statement; this Amended Disclosure Statement describes the Plan, but it is the Plan itself that will, if confirmed, establish your rights.

As a Creditor, your acceptance of the Plan is important. Acceptance of the Plan by a Class of Creditors requires a vote by at least two-thirds (⅔) in claim amount and more than fifty percent (50%) in number of allowed claims in the class that actually cast votes. Failure to vote on the plan does not count as either an acceptance or rejection of the Plan.

A.    **Purpose of the Disclosure Statement.**

This Amended Disclosure Statement describes:

- The Debtors and significant events during the bankruptcy case;
- How the Plan proposes to treat claims or equity interests of the type you hold (i.e., what you will receive on your claim or equity interest if the plan is confirmed);
- Who can vote on or object to the Plan;
- What factors the Bankruptcy Court (the "Court") will consider when deciding whether to confirm the Plan;
- Why the Proponent believes the Plan is feasible, and how the treatment of your claim or equity interest under the Plan compares to what you would receive on your claim or equity interest in liquidation, and;
- The effect of confirmation of the Plan.

B.    **Definitions.**

Unless a word is otherwise defined in this Amended Disclosure Statement, it has the meaning given to it in the U.S. Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules of Bankruptcy Procedure for the District of Arizona or the Definition section in the Plan.

././/

././/

### C. **Authorized Representations.**

This Disclosure Statement is the only document authorized by the Bankruptcy Court to be used in connection with the solicitation of votes on the Plan.

### D. **Voting Procedures.**

To be entitled to vote, a Creditor must have an allowed claim that is impaired under the Plan. The Bankruptcy Code defines whether a Claim is impaired in 11 U.S.C. § 1124. Summarily, a Claim is impaired if the Plan modifies the legal, equitable or contractual rights of the Claimant, or if the Plan does not cure and reinstate the legal rights of the Claimant upon default. A Creditor in a Class that will not, under any circumstances, receive any distributions under the Plan, is not entitled to vote because the class of which it is a member is deemed to have rejected the Plan.

If a Creditor holds more than one Claim in one Class, all of the Claims in such Class will be aggregated and the Creditor will be entitled to one vote in the amount of all aggregated Claims in that Class. See Article XII for additional discussion regarding Voting Procedures.

The proposed distributions under the Plan are discussed in this Disclosure Statement. This Plan provides for various classes of secured claims, unsecured claims, and priority claims. Unsecured creditors holding allowed claims may not be paid in full. This Plan also provides for the payment of administrative and priority claims.

### E. **Confirmation of the Plan.**

In order for the Plan to be effective, it has to be confirmed. Confirmation of the Plan means that the Court has approved the Plan. For the plan to be confirmed, votes by each impaired class representing at least two-thirds (⅔) in amount of the allowed Claims voting in

each Class and greater than one-half (½) in number of individual creditors for such class (of those actually casting votes) must be submitted in favor of acceptance of the proponent's Plan.

If the requisite acceptances are not obtained from one or more impaired Classes, the Court may nonetheless confirm the proponent's plan pursuant to 11 U.S.C. § 1129(b). If one impaired Class accepts the Plan and the Court finds that the Debtors' Plan provides, among other things, fair and equitable treatment of the Classes rejecting the Plan and that Creditors received as much or more under the Plan than they would receive in a Chapter 7 Liquidation (discussed more fully below), the Court may confirm the Plan. *See*, Article XII for an additional discussion regarding the Plan Confirmation Process. When confirmed by the Bankruptcy Court, this Plan will bind all holders of Claims or equity interests of the Debtors, whether or not they are entitled to vote, or did vote, on the Plan and whether or not they received or retained any distributions of property under the plan.

## II    INFORMATION ABOUT THE DEBTORS

### A.    Pre-Bankruptcy Filing Factual Background

Debtors Ruben and Linda Preston were sued by Midland Funding, LLC in September of 2012 in the East Mesa Justice Court in Maricopa County, State of Arizona; Case No. CC2012-179555. Because the Debtors' were struggling to maintain payments on their existing debts and assets, Debtors' believed that if Midland Funding were to obtain a judgment and begin to garnish wages, then they would no longer be able to maintain payments on their home, vehicles and other living expenses.  Thus the Debtors' filed for Chapter 13 bankruptcy protection to allow them to pay off secured and priority debt, as well as a portion of the unsecured debt.

././.

././.

## B.     <u>Post-Bankruptcy Filing Events</u>

### 1.     Filing of Chapter 13 Case

Debtors filed a Chapter 13 and a Chapter 13Bankruptcy Repayment Plan on January 16, 2013 (Dockets No. 1 and 2). The Debtors' proposed to pay off the secured balance on their vehicle loans and also the reduce interest rate on them; proposed to cram down the secured loan on their boat pursuant to section 506(a) of the bankruptcy code; as well as pay the secured portion and priority portion of their tax debt.

The Chapter 13 Trustee in his evaluations and recommendation objected to the Debtors' retention of the boat and boat trailer as he viewed them as luxury items. After some discussion with the Chapter 13 Trustee's staff attorney attempting to resolve this objection, it was determined that the Trustee was not going to withdraw his objection. After discussion and determining what options the Debtors' had, the Debtors' decided to convert their Chapter 13 case to a Chapter 11 case.

### 2.     Conversion of Chapter 13 Case to Chapter 11 Case.

A Motion to Convert the Chapter 13 Case to a case under Chapter 11 was filed on May 17, 2013 (Docket No. 21). No Objections were filed or received and a hearing was held before Judge Ballenger of the Bankruptcy Court on the Motion to Convert on June 19, 2013. The Court Ordered the Conversion to Chapter 11 on June 21, 2013 (Docket No. 31).

### 3.     Retention of Steadman Law Firm, PLC

The Debtors retained Steadman Law Firm, PLC to act as their bankruptcy counsel. The Court signed an Order approving the retention of Steadman Law Firm, PLC on August 12, 2013 (Docket No. 45).

././/

## C. Current Financial Condition of Debtors

The Debtors' assets, liabilities and community interests are fully disclosed in the Debtors' Schedules and Statement of Financial Affairs filed in this matter. Debtors rely on their salaries from the City of Mesa and SMI Imaging, LLC for all of their income.

Debtors' monthly operating statements for June, July, August, September, October November and December 2013 have been filed with the Court and are available from the Clerk. Debtors have paid all quarterly fees, as required, to the Office of the U.S. Trustee. According to Amended Schedules I and J, Debtors have disposable income of $2,550.00 per month. (*See, Amended Schedules I and J, attached hereto as Exhibit B*).

### 1. Debtors' Interest in Real Property and Homestead Exemption

### a. 459 N. Orlando Circle, Mesa, AZ 85205

The Debtors' personal residence is located at: 459 N. Orlando Circle, Mesa, AZ 85205 ("the Homestead") and the property has no equity in excess of that afforded under Arizona's homestead exemption, A.R.S. § 33-111(A). The Debtors' purchased this home in March of 2005 and currently have a first position Deed of Trust ("DOT") and Second Position DOT secured by the property. Both of these DOT's are held by CitiMortgage, Inc.

### b. 952 S. 79th Way, Mesa, AZ 85208.

This is the Debtors' Mother's home. This home was purchased by the Debtors' Mother on August 25, 2008. Debtors' co-signed on the note for this home mortgage as Debtors' Mother was retired and did not have enough existing Credit to qualify for the mortgage; and Debtors' are listed on the property deed as Joint-Tenants with Right of Survivorship. However, Debtors' Mother lives in the home by herself and maintains the home herself and has since the home was purchased. The Mother maintains all mortgage payments, insurance payments and tax payments.

Other than assisting the Mother with landscaping and general home maintenance, the Debtors' have very little to do with the home.

### 2. Debtors' Interest in Personal Property

#### a. Debtors' Vehicles

Debtors' own and maintain two vehicles which act as their primary means of transportation; and allow Debtors' to maintain their work schedule and perform other duties as necessary. These vehicles are a 2011 Chevrolet Equinox Sport-Utility Vehicle (SUV) and 2005 Chevrolet Avalanche Sport-Utility Truck (SUT).

##### i. 2011 Chevrolet Equinox SUV

Debtors' purchased this vehicle from Power Chevrolet Superstition Springs on December 3, 2010. The vehicle is financed through Americredit Financial Services, Inc. (dba GM Financial of Arizona) (Proof of Claim No. 1). This vehicle had approximately 22,000 miles at the time of the original petition filing date and is considered to be in excellent condition.

##### ii. 2005 Chevrolet Avalanche SUT

Debtors' financed this vehicle through Wells Fargo on December 3, 2011. This vehicle is financed through Wells Fargo Auto Finance, a division of Wells Fargo Bank, N.A. (Proof of Claim No. 3). This vehicle had approximately 60,000 miles on it at the time of the original petition filing date and is considered to be in good condition.

#### b. Motorboat

Debtors' own and maintain one motorboat and boat trailer. These are a 2006 Sea Ray 220 Select motorboat and 2006 Shorelander boat trailer. Debtors' purchased this boat and boat trailer from MarineMax of Arizona, Inc. on February 25, 2006. This boat is financed through Home Loan State Bank (Proof of Claim No. 7).

### c. Miscellaneous

The Debtors own no other personal property having significant value in excess of allowable state exemption limits.

### D. Projected Recovery of Avoidable Transfers

The Debtors are not aware of any preference, fraudulent conveyance, or other potential avoidance actions.

### E. Claim Objections

Except to the extent that a claim is already allowed pursuant to a final non-appealable order, the Debtors reserve the right to object to claims. Therefore, even if your claim is allowed for voting purposes, you may not be entitled to a distribution if an objection to your claim is later upheld. The procedures for resolving disputed claims are set forth in the Plan.

## III SUMMARY OF THE PLAN OF REORGANIZATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS

The Debtors will retain control of their assets and use their income to make payments set forth in Article IV of the Plan. All funds remaining in the Plan Fund shall be turned over to the Debtors upon payment of all Allowed Claims in full or to the duly appointed and acting Chapter 7 Trustee if this case is converted to Chapter 7.

### A. What is the Purpose of the Plan of Reorganization?

As required by the Code, the Plan places claims and equity interests in various classes and describes the treatment each class will receive. The Plan also states whether each class of claims or equity interests is impaired or unimpaired. If the Plan is confirmed, your recovery will be limited to the amount provided by the Plan.

./././

As required by § 1122 of the Bankruptcy Code, Creditors are divided into Classes, each of which includes Creditors who are similarly situated with other Creditors in the Class. With the exception of payments to Class 1 Claims, distributions will commence on the first (1st) day of the second (2nd) month following the Effective Date ("Initial Distribution") and Claims will be paid in accordance with the terms set forth in Article IX below. The classes provided for by the Plan and their treatment under the Plan is as follows:

**B.      Unclassified Claims.**

Certain types of claims are automatically entitled to specific treatment under the bankruptcy code. They are not considered impaired and holders of such claims do not vote on the Plan. They may, however, object if, in their view their treatment under the Plan does not comply with that required by the Code. As such, the Plan Proponent has not placed the following claims in any class:

**1.      Class 1 - Administrative Claims**

Administrative expenses are costs or expenses of administering the Debtors' chapter 11 case which are allowed under § 507(a)(2) of the Code. Administrative expenses also include the value of any goods sold to the Debtor in the ordinary course of business and received within 20 days before the date of the bankruptcy petition. The Code requires that all administrative expenses be paid on the effective date of the Plan, unless a particular claimant agrees to a different treatment.

Debtors' counsel has agreed to represent the Estate on an hourly basis. The court approved a detailed employment application. Debtors' counsel will periodically apply to the court for approval to pay Counsel pursuant to the employment application.

The Debtors will pay fees to the United States Trustee as they become due.

C. **Classes of Claims and Equity Interests**

The following are the classes set forth in the Plan, and the proposed treatment that they will receive under the Plan:

1. **Priority Tax Claims**

Priority Tax Claims are unsecured income, employment, and other taxes described by § 507(a)(8) of the Code. Unless the holder of such a § 507(a)(8) priority tax claim agrees otherwise, it must receive the present value of such claim, in regular installments paid over a period not exceeding five years from the order of relief.

The following chart lists all classes containing Debtors' unsecured priority claims and their proposed treatment under the plan:

| Class No. and Impairment | Description, Treatment and Value of Secured Property |
|---|---|
| **2.** **Unimpaired** | Class 2 consists of the Priority Tax Claim of the Internal Revenue Service. This creditor has filed a claim (Amended Claim No. 12) in the amount of $33,119.72; this is for tax years 2002, 2003, 2004, 2006, 2007, 2010, and 2011. The total amount of the unsecured priority claim is $6,117.38 plus 3.00% interest. Monthly payments will not be less than $135.40. Payments will begin 30 days after the effective date and continue until paid in full. |

2. **Classes of Secured Claims**

Allowed Secured Claims are claims secured by property of the Debtor's bankruptcy estate (or that are subject to setoff) to the extent allowed as secured claims under § 506 of the Code. If

the value of the collateral or setoffs securing the creditor's claim is less than the amount of the creditor's allowed claim, the deficiency will be classified as a general unsecured claim.

The following chart lists all classes containing Debtors' secured prepetition claims and their proposed treatment under the Plan:

| Class No. and Impairment | Description, Treatment and Value of Secured Property |
|---|---|
| **3A.** <br> **Unimpaired** | CitiMortgage, Inc. secured by a first position Deed of Trust on the property located at: 459 N. Orlando Circle, Mesa, AZ 85205 ("the Homestead). To the extent the loan documents provide for default resulting from the Debtors' bankruptcy filing, such default shall not be enforceable. The Class 3 Secured Claimant shall retain a lien securing its allowed claim. The Debtors will continue to make regularly scheduled monthly payments in accordance with the pre-bankruptcy loan documents. The Debtors estimate that the Class 4 Claim is no more than $82,000.00. |
| **3B.** <br> **Unimpaired** | CitiMortgage, Inc. secured by a second position Deed of Trust on the property located at: 459 N. Orlando Circle, Mesa, AZ 85205 ("the Homestead). To the extent the loan documents provide for default resulting from the Debtors' bankruptcy filing, such default shall not be enforceable. <br><br> The Class 3 Secured Claimant shall retain a lien securing its allowed claim. The Debtors will continue to make regularly scheduled monthly payments in accordance with the pre-bankruptcy loan documents. The Debtors estimate that the Class 2 Claim is no more than $43,000.00. |

| | |
|---|---|
| | Ocwen Loan Servicing, LLC secured by a first position Deed of Trust on the property located at: 952 S. 79th Way, Mesa, AZ 85208. To the extent the loan documents provide for default resulting from the Debtors' bankruptcy filing, such default shall not be enforceable. The Class 3 Secured Claimant shall retain a lien securing its allowed claim. The Creditor will continue to receive regularly scheduled monthly payments in accordance with the pre-bankruptcy loan documents. The Debtors estimate that the Class 3 Claim is no more than $83,000.00. |
| **3C.** <br><br> **Unimpaired** | This claim is for Debtors' Mother's home. This home was purchased by the Debtors' Mother on August 25, 2008. Debtors' co-signed on the note for this home mortgage as Debtors' Mother was retired and did not have enough existing Credit to qualify for the mortgage; and Debtors' are listed on the property deed as Joint-Tenants with Right of Survivorship. <br><br> However, Debtors' Mother lives in the home by herself and maintains the home herself, and has since the home was purchased. The Mother maintains all mortgage payments, insurance payments and tax payments. Other than assisting the Mother with landscaping and general home maintenance, the Debtors' have very little to do with the home. |
| **3D.** <br><br> **Impaired** | Americredit Financial Services, Inc. (dba GM Financial of Arizona) (Proof of Claim No. 1). This claim is for Debtors' 2011 Chevrolet Equinox Sport-Utility Vehicle (SUV). Debtors' purchased this vehicle from Power Chevrolet Superstition Springs on December 3, 2010. |

| | |
|---|---|
| | This is a secured claim in the amount of $20,068.88, with a contract interest at rate of 12.50%. The fair market value of the property is $19,000.00. This figure is based on the Debtors' personal opinion and is supported by Kelly Blue Book (www.kbb.com) vehicle evaluations. This claim will be paid $20,068.88 plus accruing interest at a rate of five percent (5.00%). Monthly payments will not be less than $524.50. Payments will begin 30 days after the effective date and continue until paid in full. |
| **3E.**<br><br>**Impaired** | Wells Fargo Auto Finance, a division of Wells Fargo Bank, N.A. (Proof of Claim No. 3). This claim is for Debtors' 2005 Chevrolet Avalanche Sport-Utility Truck (SUT). Debtors' financed this vehicle Wells Fargo on December 3, 2011.<br><br>This is a secured claim in the amount of $20,229.89 with a contract interest at rate of 15.49%. The fair market value of the property is $15,600.00. This figure is based on the Creditor's proof of claim. By stipulation of the parties, this creditor will be paid $19,286.76, plus eight percent (8.00%) interest. Monthly payments will not be less than $620.52. Payments will begin 30 days after the effective date and continue until paid in full. |
| **3F.**<br><br>**Impaired** | Claim of Home Loan State Bank (Proof of Claim No. 7). This claim is for Debtors' 2006 Sea Ray 220 Select motorboat and 2006 Shorelander boat trailer. Debtors' purchased this boat and boat trailer from MarineMax of Arizona, Inc. on February 25, 2006. |

| | |
|---|---|
| **3F.**<br><br>**Impaired** | This is a secured claim in the amount of $38,947.26 with a contract interest at rate of 8.90%. The fair market value of the property is $29,415.00. This figure is based on the Creditor's proof of claim. This claim will be paid the fair market value of $29,415.00 plus five percent (5.00%) interest with the remainder being treated as a general unsecured claim.<br><br>Monthly payments will not be less than $519.24. Payments will begin 30 days after the effective date and continue until paid in full. |
| **3G.**<br><br>**Impaired** | Claim of the Internal Revenue Service (IRS) (Amended Proof of Claim No. 12). This is a secured claim in the amount of $33,119.72. This claim will be paid $10,065.00 with no interest; with the remainder balance of $16,936.61 being treated as a general unsecured claim. Payments will begin 30 days after the effective date and continue until paid in full. |

**3.** **Classes of Priority Unsecured Claims Other Than Those Arising Under § 507(a)(8).**

Certain priority claims that are referred to in §§ 507(a)(1), (4), (5), (6), and (7) of the Code are required to be placed in classes. The Code requires that each holder of such a claim receive cash on the effective date of the Plan equal to the allowed amount of such claim. However, a class of holders of such claims may vote to accept different treatment. The Debtors anticipate that no such claims exist.

### 4. Class of General Unsecured Claims

General unsecured claims are not secured by property of the estate and are not entitled to priority under §507(a) of the Bankruptcy Code. Payments will be made in annual installments on the anniversary date of the Initial Distribution, to the extent that such funds are available. The payment to the Allowed General Unsecured Claims will be generated from the Debtors' income. Allowed General Unsecured Claims shall not include any interest charges, fees, or other costs incurred or assessed after the Petition Date through and including the Effective Date of the Plan and thereafter

The amount projected to be paid to the General Unsecured Creditors under the Plan is approximately $15,721.08, or approximately 17% of the total General Unsecured Claims. This amount is based on the Debtors' making 48 payments of $2,550.00 over a period of 48 months.

However, should a General Unsecured Creditor object to its treatment under the Plan; Debtors' repayment period may be extended to 60 payments of $2,550.00 over a period of 60 months. In the event that the Plan is extended to 60 months, then the total amount paid to General Unsecured Creditors would be approximately $41,310.00 or 47% of the total General Unsecured Claims. The following chart identifies the Plan's proposed allowed general unsecured claims against the Debtors describes it projected payout:

| Class No. and Impairment | Description, Treatment and Value of Secured Property |
|---|---|
| **4.** **Impaired** | Holders of allowed general unsecured claims will receive a *pro rata* distribution of the Debtors' disposable income after Unclassified Claims, Secured Claims and Priority Non-Tax Claims are paid. The amount paid to this class will exceed the Chapter 7 reconciliation requirement and is |

estimated to be approximately $15,721.08 or 17.88% of the total general unsecured claims. The term "allowed general unsecured claim" will refer to and mean every claim as to which either (1) the Debtor has scheduled on Schedule F, unless the claim has been scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim, unless an objection has been filed to such proof of claim or equity interest.

A schedule of allowed general unsecured claims is attached to the Plan.

### 5. Class of Equity Interest Holders

Equity interest holders are parties who hold an ownership interest (*i.e.*, equity interest) in the Debtors. In a corporation, entities holding preferred or common stock are equity interest holders. In a partnership, equity interest holders include both general and limited partners. In a Limited Liability Company ("LLC"), the equity interest holders are the members. Finally, with respect to individuals who are debtors, the Debtors are the equity interest holders.

The following chart sets forth the Plan's proposed treatment of the class of equity interest holders:

| Class No. and Impairment | Description, Treatment and Value of Secured Property |
|---|---|
| **5.**<br><br>**Unimpaired** | Debtors shall retain all of the legal and equitable interest in exempt and non-exempt assets of this estate. All estate property shall vest in the Debtors at confirmation. |

**D.**    **Risk Factors**

The Debtors' ability to earn income is the only risk factor in this case. Based on the Debtors' stable work history, they are expected to keep their jobs and salary.

**E.**    **Executory Contracts and Unexpired Leases**

The Plan lists all executory contracts and unexpired leases that the Debtors will assume under the Plan. Assumption means that the Debtors have elected to continue to perform the obligations under such contracts and unexpired leases, and to cure defaults of the type that must be cured under the Code, if any.

If you object to the assumption of your unexpired lease or executory contract, the proposed cure of any defaults, or the adequacy of assurance of performance, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan, unless the Court has set an earlier time.

All executory contracts and unexpired leases that are not expressly assumed will be rejected under the Plan. Consult your adviser or attorney for more specific information about particular contracts or leases.

If you object to the rejection of your contract or lease, you must file and serve your objection to the Plan within the deadline for objecting to the confirmation of the Plan.

**F.**    **Tax Consequences of Plan**

The confirmation and consummation of the Plan may result in federal and state income tax consequences to holders of claims. Tax consequences to a particular creditor will depend on the particular circumstances regarding the claim of that creditor.

***Creditors and Equity Interest Holders Concerned with How the Plan May Affect Their Tax Liability Should Consult with Their Own Accountants, Attorneys, and/or Advisors.***

**IV**    **CONFIRMATION REQUIREMENTS AND PROCEDURES**

To be confirmable, the Plan must meet the requirements listed in §§ 1129(a) or (b) of the Code. These include the requirements that: the Plan must be proposed in good faith; at least one impaired class of claims must accept the plan, without counting votes of insiders; the Plan must distribute to each creditor and equity interest holder at least as much as the creditor or equity interest holder would receive in a chapter 7 liquidation case, unless the creditor or equity interest holder votes to accept the Plan; and the Plan must be feasible. These requirements are not the only requirements listed in § 1129, and they are not the only requirements for confirmation.

**A.**    **Who May Vote or Object**

Any party in interest may object to the confirmation of the Plan if the party believes that the requirements for confirmation are not met. Many parties in interest, however, are not entitled to vote to accept or reject the Plan. A creditor or equity interest holder has a right to vote for or against the Plan only if that creditor or equity interest holder has a claim or equity interest that is both (1) allowed or allowed for voting purposes and (2) impaired.

In this case, the Plan Proponent believes that classes are impaired and that holders of claims in each of these classes are therefore entitled to vote to accept or reject the Plan. The Plan Proponent believes that classes are unimpaired and that holders of claims in each of these classes, therefore, do not have the right to vote to accept or reject the Plan.

**1.**    **What Is an Allowed Claim or an Allowed Equity Interest?**

Only a creditor or equity interest holder with an Allowed Claim or an allowed equity interest has the right to vote on the Plan. Generally, a claim or equity interest is allowed if either (1) the Debtor has scheduled the claim on the Debtors' schedules, unless the claim has been

scheduled as disputed, contingent, or unliquidated, or (2) the creditor has filed a proof of claim or equity interest, unless an objection has been filed to such proof of claim or equity interest. When a claim or equity interest is not allowed, the creditor or equity interest holder holding the claim or equity interest cannot vote unless the Court, after notice and hearing, either overrules the objection or allows the claim or equity interest for voting purposes pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure.

### 2.     What Is an Impaired Claim or Impaired Equity Interest?

As noted above, the holder of an allowed claim or equity interest has the right to vote only if it is in a class that is impaired under the Plan. As provided in § 1124 of the Code, a class is considered impaired if the Plan alters the legal, equitable, or contractual rights of the members of that class.

### 3.     Who is Not Entitled to Vote

The holders of the following five types of claims and equity interests are not entitled to vote:

- Holders of claims and equity interests that have been disallowed by an order of the Court;
- Holders of other claims or equity interests that are not "allowed claims" or "allowed equity interests" (as discussed above), unless they have been "allowed" for voting purposes.
- Holders of claims or equity interests in unimpaired classes;
- Holders of claims entitled to priority pursuant to §§ 507(a)(2), (a)(3), and (a)(8) of the Code; and

- Holders of claims or equity interests in classes that do not receive or retain any value under the Plan;

- Administrative expenses.

***Even If You Are Not Entitled to Vote on the Plan, You Have a Right to Object to the Confirmation of the Plan and to the Adequacy of the Disclosure Statement.***

### 4. Who Can Vote in More Than One Class

A creditor whose claim has been allowed in part as a secured claim and in part as an unsecured claim, or who otherwise hold claims in multiple classes, is entitled to accept or reject a Plan in each capacity, and should cast one ballot for each claim.

### B. Votes Necessary to Confirm the Plan

If impaired classes exist, the Court cannot confirm the Plan unless (1) at least one impaired class of creditors has accepted the Plan without counting the votes of any insiders within that class, and (2) all impaired classes have voted to accept the Plan, unless the Plan is eligible to be confirmed by "cram down" on non-accepting classes, as discussed later in Section IV(B)(2).

### 1. Votes Necessary for a Class to Accept the Plan

A class of claims accepts the Plan if both of the following occur: (1) the holders of more than one-half (1/2) of the allowed claims in the class, who vote, cast their votes to accept the Plan, and (2) the holders of at least two-thirds (2/3) in dollar amount of the allowed claims in the class, who vote, cast their votes to accept the Plan.

A class of equity interests accepts the Plan if the holders of at least two-thirds (2/3) in amount of the allowed equity interests in the class, who vote, cast their votes to accept the Plan.

### 2. <u>**Treatment of Non-accepting Classes**</u>

Even if one or more impaired classes reject the Plan, the Court may nonetheless confirm the Plan if the non-accepting classes are treated in the manner prescribed by § 1129(b) of the Code. A plan that binds non-accepting classes is commonly referred to as a "cram down" plan. The Code allows the Plan to bind non-accepting classes of claims or equity interests if it meets all the requirements for consensual confirmation except the voting requirements of § 1129(a)(8) of the Code, does not "discriminate unfairly," and is "fair and equitable" toward each impaired class that has not voted to accept the Plan.

Moreover, even if one or more holders of an allowed unsecured claim objects to the confirmation of the plan, the Court may nonetheless confirm the Plan if the claim is treated in the manner prescribed by § 1129(a)(15) of the Code. Section 1129(a)(15) requires that (A) the value, as of the effective date of the plan, of the property to be distributed under the plan on account of such claim is not less than the amount of such claim, or (B) that the value of the property to be distributed under the Plan is not less than the projected disposable income of the debtor (as defined in § 1325(b)(2)) to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

Section 1325(b)(2) defines disposable income as current monthly income received by the debtor (other than child support payments, foster care payments, or disability payments for a dependent child made in accordance with applicable non-bankruptcy law to the extent reasonably necessary to be expended for such child) less amounts reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor, or for a domestic support obligation, that first becomes payable after the date the petition is filed; and

(ii) for charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3) to a qualified religious or charitable entity or organization (as defined in section 548(d)(4)) in an amount not to exceed fifteen percent (15%) of gross income of the debtors for the year in which the contributions are made; and (B) if the debtors are engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business. This definition is calculated by using the six (6) month period prior to the Debtors' bankruptcy filing.

Using these definitions, Debtors' projected disposable income as shown on Form 22B and their Amended Schedules I and J filed with this bankruptcy consisted of the Debtors' wages. According to Form 22B, Debtors' current monthly income was $8,928.50. According to Debtors' Schedule J, which identifies the amounts reasonably necessary to be expended for the maintenance or support of the debtors or dependent of the debtors, Debtors' projected disposable income was $2,550.00, and such monthly amount over four years is $122,400.00.

***You should consult your own attorney if a "cram down" confirmation will affect your claim or equity interest, as the variations on this general rule are numerous and complex.***

  C.  <u>Liquidation Analysis</u>

To confirm the Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim and equity interest holders would receive in a chapter 7 liquidation.

The assets of this estate are made up of all the real and personal property listed on Petition Schedules A and B. Schedule A shows that the Debtors own no non-exempt property. Schedule B shows equity in non-exempt property of approximately $701.78. The valuation of all items of

personal property is based on the Debtors' opinion, and in the case of the automobiles is supported by the Kelly Blue Book.

The liquidation value of these assets is estimated at $0.00. To determine this amount, Debtors' subtracted the hypothetical chapter 7 trustee's fees and costs, approximately $71.00 (10% of the estimated non-exempt assets); and the amount of the priority debt, approximately $6,117.38 from the non-exempt property totaling $701.78. Subtracting the total amount of $6,188.38 ($71.00 + $6,117.38) from $701.78 equals -$5,486.60. This is why Debtors' believe that the liquidation value is $0.00.

The Plan pays approximately $15,721.08 to general non-priority unsecured creditors. In a hypothetical Chapter 7 case, general non-priority unsecured creditors would be paid zero, as all proceeds from the liquidation of non-exempt property would be paid to the priority unsecured creditors. Thus, unsecured creditors of the Estate will receive a higher return under Debtors' Chapter 11 Plan than they would if the bankruptcy were converted to Chapter 7.

### D.     Feasibility

The Court must find that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor, unless such liquidation or reorganization is proposed in the Plan.

All of the Debtors' income is derived from their employment. The Debtors have been employed in the same or similar jobs for many years and the Debtors do not expect this to change over the life of this Plan.

***You Should Consult with Your Accountant or other Financial Advisor If You Have Any Questions Pertaining to These Projections.***

## V.    EFFECT OF CONFIRMATION OF PLAN

### A.    Discharge of Debtor

Confirmation of this Plan does not discharge any debt provided for in this Plan until the court grants a discharge on completion of all payments under this Plan, or as otherwise provided in § 1141(d)(5) of the Code. The Debtors will not be discharged from any debt excepted from discharge under § 523 of the Code, except as provided in Rule 4007(d) of the Federal Rules of Bankruptcy Procedure.

### B.    Modification of Plan

The Plan Proponent may modify the Plan at any time before confirmation of the Plan. However, the Court may require a new disclosure statement and/or revoting on the Plan. Upon request of the Debtors, the United States trustee, or the holder of an allowed unsecured claim, the Plan may be modified at any time after confirmation of the Plan but before the completion of payments under the Plan, to (1) increase or reduce the amount of payments under the Plan on claims of a particular class, (2) extend or reduce the time period for such payments, or (3) alter the amount of distribution to a creditor whose claim is provided for by the Plan to the extent necessary to take account of any payment of the claim made other than under the Plan.

### C.    Post-Confirmation Financial Reports

The Debtor will file quarterly post-confirmation financial reports pursuant to Fed. R. Bankr. P. 2015(a)(5).

## VI.    DISCLAIMER

NO REPRESENTATIONS CONCERNING THE DEBTORS OR THE PLAN ARE AUTHORIZED BY THE DEBTORS OTHER THAN THOSE STATED HEREIN. YOU SHOULD NOT RELY ON ANY REPRESENTATIONS OR INDUCEMENTS

CONCERNING THE PLAN OTHER THAN THOSE CONTAINED IN THIS DISCLOSURE STATEMENT. THE BANKRUPTCY COURT'S APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE A CERTIFICATION OR RULING BY THE COURT REGARDING THE COMPLETENESS OR ACCURACY OF ANY STATEMENTS CONTAINED HEREIN.

**VII        <u>CONCLUSION</u>**

It is respectfully submitted that Debtors have given every thought to the complex problems confronting them and, with the assistance of counsel, has devised a formulated this Plan with the hope that the equitableness of the Plan will be considered by the creditors. It is sincerely hoped that all creditors will join in and consent to the Plan so that they, as well as the Debtors, will receive the maximum results.

Submitted this ___16th___ Day of December, 2013        STEADMAN LAW FIRM, PLC

                                                                              _/s/ Morgan B. McCain_____
                                                                              Timothy W. Steadman
                                                                              Morgan B. McCain
                                                                              1310 E. Southern Avenue, Suite 201
                                                                              Mesa, AZ  85203-5139
                                                                              *Attorneys for Debtors*